# COURT OF APPEALS OF TEXAS.

## TYLER TERM, 1885.

### [No. 1893.]

### Ed. Adams v. The State.

19 1
30 615

1. **Continuance — Fact Case.** — See the statement of the case for evidence set forth in an application for a continuance, which, in view of the sufficiency of the application in all other respects, entitled the defendant to a continuance.

2. **Same — Practice.** — The trial court has no power to adjourn the hearing of testimony in a case on trial from the court-house to the house of a witness detained by illness, and to compel the defendant to accompany the court and jury to such house for the purpose of obtaining the testimony of the witness. It is, therefore, no answer to an application for a continuance, based upon the absence of the sick witness, that the defendant declined to go to the witness's house with the court and jury for the purpose of obtaining the evidence of the witness. All proceedings in a trial should be had at the court-house.

3. **Same.** — **New Trial** should be awarded by the trial court, when, at the conclusion of the trial, it appears, in view of the evidence adduced, that a continuance was improperly refused.

Appeal from the District Court of Polk. Tried below before the Hon. J. I. Perkins.

The conviction in this case was for an assault with intent to murder one Sam Leggett, in Polk county, Texas, on the 24th day of December, 1884. A term of two years in the penitentiary was the penalty awarded by the jury.

The defendant's application for a continuance alleged that he could not safely go to trial without the testimony of several witnesses, and among them, Mrs. C. C. Adams; that a subpœna issued out of the district court of Polk county for the said Mrs. C. C. Adams, on the 1st day of June, 1885, and was, on the following day, placed in the hands of the sheriff, and by him executed on the said witness on the following 6th day of the said June; that the said witness, Mrs. C. C. Adams, was now at her home, about a half mile from the court-house, ill in bed, and unable to attend court without great peril to her life, as shown by the attached affidavit of her attending physician; that the witness was not absent by the pro-

curement or consent of the defendant; that the application was not made for delay, and that there was no reasonable expectation that defendant could procure the attendance of the said absent witness by a postponement of the trial to a future day of the term. The defendant, according to his application, expected to prove by the said absent witness that she saw the commencement of the conflict; that S. P. Leggett, the prosecuting witness, before appellant made any demonstration against him in any manner, made an assault on appellant with a deadly weapon, and shot at him with a pistol, and this before appellant was armed, and before he had made any assault on Leggett or attempt to do so, appellant being at the time in his own house.

Sam Leggett was the first witness for the State. He testified that both he and the defendant resided in the town of Moscow, Polk county, Texas, in houses built alike, about thirty feet apart, fronting the same way, their yards divided by a common fence. Two trails led from the witness's gate, inside of his yard, one direct to his house and the other to a well, which was a common well on the line of the dividing fence. The gates respectively of the witness and the defendant fronted the front doors of their respective houses at a distance of about thirty feet, and were about the same distance apart. Witness left his brother's store in Moscow, to go to his home, about 9 o'clock on the morning of December 24, 1884. He was walking. Just as he reached and opened his front gate, he heard screaming at the defendant's house. Looking in that direction he saw the defendant and his wife in their gallery scuffling over a gun. Defendant said, as witness understood him, "G—d d—n it, let me go," and jerked the gun from his wife's hands. Witness then started from his gate to his house, but the defendant, springing off his gallery and throwing his gun down on witness, he, witness, began to back. Defendant then, with his gun in his hands, climbed the cross fence into the witness's yard, and looked at the witness's wife, who by this time had come out to the gallery with the witness's gun in her hands. When the defendant looked at witness's wife, witness stepped backwards towards his gate, and was in the act of getting behind the gate post, when the defendant fired on him, striking him in the thigh with two buck shot. Other buck shot passed through the clothing of the witness, and still others struck, or glanced, on the fence and gate post.

When the defendant reached the witness's yard, over the fence, he said to witness: "G—d d—n you, I am going to kill you." Witness then backed to his gate because he saw that he could not reach

his house alive. He had to back eight or ten feet to reach his gate. After firing upon the witness the defendant ran to and climbed the fence back into his own yard. Witness fired at the defendant first as he climbed the fence back into his own yard, again just as he reached his door steps, and again as he passed through his door into his house. These shots the witness fired from his forty-four caliber Colt's six-shooter. That pistol belonged to the witness and not to Thad Goodwin. Witness did not draw nor attempt to draw his pistol until after he was shot by the defendant. The wife of the witness was a sister of the defendant. The defendant fired upon the witness, with a double-barreled shot-gun, at a distance of about twenty-five feet. J. H. Adams, the father of the defendant, lived in a house across the street, and in a southwest direction from witness's house, about sixty feet distant.

The witness did not remember that on the morning of the difficulty, and before it occurred, on Thad Goodwin's saloon gallery, in the presence of Thad Goodwin, Thomas Victory and J. P. Straughn, he said that the defendant was in his house and afraid to come out; that the Joneses had been up all night guarding him, and that if he did come out witness would make him smell shot if he did not retract what he had called the witness, *i. e.*, "a G—d d—d kinky-headed son-of-a-b—h." It was the recollection of the witness that, at the time and place referred to, he said that the defendant had called him a G—d d—d kinky-headed son-of-a-b—h, and that, if he did not retract, witness would make him smell shot or kill him. On the morning of, and before the difficulty occurred, the witness told Frank Wilson that the defendant had applied to him the epithet quoted, and that unless he made a retraction he and witness would have to shoot it out or witness would kill him. Witness made substantially the same statement to J. H. Adams, the father of the defendant, on the night before the shooting. Sam Adams, the brother of the defendant, came to the well for water on the morning of and before the difficulty, where he was met by the witness. Witness remarked to him: "I suppose Ed. (the defendant) is well heeled this morning." Sam replied: "No." Witness then said to Sam: "You tell Ed. he had better be, for he has called me a G—d d—d kinky-headed son-of-a-b—h, and unless he takes it back I will kill him." The first time witness saw the defendant after he sent this message by Sam was when he and his wife were scuffling over the gun on their gallery, just before the shooting. Witness discharged a gun in his back yard on the night before the shooting.

About an hour after dark, on the night before the shooting, in

the town of Moscow, the witness heard one Joe Jones, in a loud voice, cursing the entire Leggett family. Witness walked up to Jones, when the defendant, with both hands in his pockets, stepped in front of witness and said: "G—d d—n you, don't you strike that boy." Witness replied: "Have I shown any sign to strike him? You take your hands out of your pockets." Thereupon defendant withdrew his hands from his pockets and struck at witness with what witness took to be a dirk. It looked to witness like a metal instrument of some sort. The blow grazed the witness's forehead, making a small cut or scratch. The three parties, defendant, witness and Jones, then closed, and all three fell together. Mr. Thad Goodwin, a peace officer, and J. H. Adams, the defendant's father, separated the belligerents, and witness started off with Mr. Parsons. The defendant then called to witness and denounced him as a d—d kinky-headed son-of-a-b—h. Witness replied to this denunciation that an officer had interfered and prevented the fight and that he would not resist an officer, but that he, defendant, had to retract that epithet or he, witness, would kill him. The witness had employed counsel to prosecute this case because of the absence of the district attorney.

J. F. Wilson was the next witness for the State. He testified that he saw a part, but not all, of the difficulty. He was standing, at the time, on the gallery of Bergman's store, about two hundred yards from the houses of the defendant and Leggett. His attention was first attracted by the screaming of women in the vicinity of the houses mentioned. Looking up, witness saw Sam Leggett backing out of his gate and heard two shots fired in rapid succession. Those shots were evidently fired from a shot-gun, and by some one whom the witness could not see from his position. They were not fired by Leggett. After these two shots were fired, witness saw Leggett draw a pistol and fire three times. Immediately after the shooting, witness went to Leggett's yard and found some gun wads in the path which led from the yard gate to the well. These wads indicated that the gun was fired from a point in Leggett's yard. They could not have been fired from the defendant's gallery. The wads were scattered along the path which runs parallel with the division fence. Witness found Leggett, immediately after the shooting, lying on the ground at his gate, and assisted in removing him to his house. Meanwhile some one went for a doctor. Leggett was shot through the thigh with buck shot. Several buck shot went through a small jacket that he wore.

On the morning of the difficulty, but before it occurred, Leggett

told the witness, in Schuler's house in Moscow, that the defendant had called him a G—d d—d kinky-headed son-of-a-b—h, and that if he did not retract, he, Leggett, would kill defendant; that no man could apply that epithet to him and live in the same town; that his and defendant's galleries were thirty feet apart, and they could settle it there. Witness told Leggett that he ought not to engage in a difficulty at the defendant's house where there were women, and Leggett then said that he would not. Immediately after the shooting, witness examined Leggett's fence and gate post, and saw where they had been struck by buck shot. He saw also where one ball had struck the facing over the defendant's door. Witness did not see any one in Leggett's yard with a gun, and did not know where the wads came from. While at Schuler's house on the morning of, and before the difficulty, witness raised Leggett's hat and saw a small scratch or cut on his forehead, and remarked: "Sam, old fellow, they like to have got away with you last night." Leggett replied: "They doubled on me, and Ed. called me that he will have to take back, or he or I will have to smell shot."

J. M. Sterling was the next witness for the State. He testified that he was standing in the street near J. W. Leggett's store, in sight of the yards but not of the houses of defendant and Sam Leggett, when the shooting occurred. Witness was at Bergman's house and interfered to stop a row between John Leggett and D. Jones, just before the shooting of Sam Leggett. He saw Sam Leggett leave Bergman's to go home; saw him enter his gate and then retreat back towards his gate; then heard two reports and saw the smoke of a shot-gun fired in Leggett's yard, and next saw Leggett draw his pistol and fire three times. Witness could not see who fired the two shots from the shot-gun, but could see that they were fired in Leggett's yard. Gun wads were scattered along the path leading from the well in Leggett's yard to his gate. From where he stood witness could see Leggett's gate, but only a short distance into his yard. A house and a stable stood between the point occupied by the witness and the houses of the defendant and Leggett. Witness saw no gun at any time during the shooting. He assisted to move Leggett to his house and heard some one call for a doctor.

Doctor G. W. Daughty testified, for the State, that he heard the shots fired in the conflict which resulted in the wounding of Sam Leggett. The first two shots were fired from a shot-gun. The remaining three were fired from a pistol. After the shooting, witness went to Leggett's yard and found Leggett lying on the ground at his gate, shot through the thigh. Witness took the range of the

shots which penetrated the fence and gate post at Leggett's, and was positive that they were fired from a point in Leggett's yard. The State closed.

Joe Jones was the first witness for the defense. He testified that he was on the defendant's gallery when the shooting began. Defendant stood in his door, which opened on the gallery. Sam Leggett at that time was going in at his gate. He pushed his gate open with his left hand and at the same time drew his pistol with his right hand. Witness called to defendant: "Ed., look out." Defendant stepped back into his room, and came out with a gun, holding it in his left hand near the muzzle, with the butt resting near the floor. As defendant stepped out on the gallery Sam Leggett fired upon him. Defendant advanced upon Leggett, and Leggett fired a second shot. Defendant continued to advance, sprang over the division fence and fired once at Leggett, who was then at his gate, just as Leggett fired his third shot. These two shots were almost simultaneous. Defendant then attempted to shoot the remaining barrel of his gun at Leggett, but it snapped. Defendant then turned and went back to his own house, and, as he was walking towards his house, Leggett fired at him again. After the defendant got into his house he asked witness to reload his gun. Witness then found that one barrel of the gun was still loaded, and that an unexploded cap, which had been snapped on, was still on the tube. Witness put a good cap on that tube, and discharged that barrel of the gun on the same day, after the difficulty. Witness and defendant were double brothers-in-law, each having married the other's sister. At the time of the difficulty, witness, his wife, and defendant's wife were on defendant's gallery.

Sam Adams was the next witness for the defense. He testified that, on the morning of the difficulty but before it occurred, he went to the well, between the defendant's and Leggett's houses, for water. Leggett came out of his house and greeted witness with "Good morning, Sam." Witness replied: "Good morning." Leggett said: "I suppose Ed. is well heeled this morning." Witness answered: "No." Leggett then said: "Well, you go and tell him that he had better be, for I am going to kill him on sight, G—d d—n him; and you go and tell him so; and tell him that I told you to tell him so." Witness in reply said: "Well." After he took his water home, witness went to defendant's house and told him what Leggett said, and that Leggett told him to tell him, defendant.

On cross-examination the witness repeated his testimony in chief,

and further stated that he had not been to defendant's house before he met Leggett at the well. Witness supposed that the gun used by the defendant was Joe Jones's gun, as he saw Jones's gun at the house after the shooting. As witness started home with his water he saw Sam Leggett's wife, who was his, the witness's, sister, on the gallery, and asked her if she could do nothing with Leggett. She replied that she could not, and looked like she did not want to do anything.

Sam Jones was the next witness for the defense. He testified that he had known Sam Leggett all of his, Leggett's, life. He knew that Leggett's reputation was that of a quarrelsome, fighting man, one likely to carry any threat he might make, into execution. If Leggett were to threaten witness's life, witness would dread him. Witness saw the defendant at his own house in Moscow, on the morning of, but before the difficulty. He was then lying across his bed. Witness heard, the night before, that Leggett had threatened defendant's life, and came to town for the express purpose of trying to make peace between them. Witness was some forty or fifty yards distant from the parties when the shooting took place. Witness saw his son Joe's gun at defendant's house after the shooting was over. It was a muzzle-loading double-barreled shot-gun. The barrels were short, having been cut off. Defendant's wife was the witness's daughter.

J. H. Adams was the next witness for the defense. He testified that, just before the shooting occurred, he was sitting at the east end of his house, which stood on the opposite side of the street from Leggett's, looking out of a window. He saw Sam Leggett pass rapidly to his gate. Defendant was then standing in his own door. As Leggett pushed his gate open he drew his pistol and fired in the direction of where defendant was then standing. The women at the defendant's house began to scream. After Leggett fired, witness looked to see where the defendant was, and saw him between the end of his gallery and the division fence, in a stooping position or on his knees on the ground, looking towards Leggett. While defendant was in that position Leggett fired the second time. Witness then ran out of his south door and across the street towards the houses of defendant and Leggett, crying, "For God's sake, stop that!" As the witness stepped off his gallery into the street the defendant and Leggett fired at each other almost simultaneously. At the report of the weapons the witness saw smoke arise from where Leggett was standing, and from the direction in which he had last seen the defendant. After these two shots Leggett fired

again in the direction where witness supposed defendant then was. Four, possibly five, shots were fired. One shot may have escaped the witness's notice as he ran out of his house. There were two plank fences between the witness and the parties shooting. Leggett leaned against the gate post after the shooting was over and asked that a doctor be sent for, and the witness sent a boy for the doctor immediately.

The cross-examination of this witness effected no change in his testimony. He stated that he did not see the defendant when he reached the division fence, nor when he fired his gun, but saw the smoke arise from the gun, fired from the point where he supposed the defendant then was. On his re-examination he said that the general reputation of Leggett was that of a hot-headed, violent man, likely to carry a threat into execution.

J. P. Straughn testified, for the defense, that on the morning of, but before the shooting, he met Sam Leggett at Goodwin's saloon, and heard him say, in the presence of Goodwin and Victory, that the defendant was in his house and afraid to come out; that the Joneses had been up all night guarding him, and that if he did come out, he, Leggett, would make him smell shot. Leggett said nothing in this connection about " d—d kinky-headed son-of-a-b—h."

Sam Parsons testified, for the defense, that he heard the shooting from a distance of one hundred and fifty or two hundred yards. Four or five shots were fired. Witness could detect no difference between the several reports, and thought they were all fired from shot-guns.

Sam Jones, recalled by the defense, testified that he was about fifty yards from Leggett's gate when the shots were fired. There was nothing in the sound of the reports to distinguish the shot-gun from the pistol. A man standing between Jno. W. Leggett's store and J. H. Adams's old stand, ten feet from the former and fifteen feet from the street running in front of the stores named, could not see anything in Sam Leggett's yard. He might be able to see a person standing outside of Sam Leggett's gate. Witness expected a difficulty between the parties, because he had heard of Leggett's threat to kill the defendant, and he came to town on that morning to try to prevent any difficulty.

M. Winston testified, for the defense, that he heard the shooting from a distance of ninety or a hundred yards. He could distinguish no difference in the sound of the several reports.

Mrs. Joe Jones was the next witness for the defense. She testified that she was standing at the defendant's gate when the shoot-

ing began.   She saw Sam Leggett open his own gate and shoot at the defendant, who at that time, unarmed, was standing in his door with his wife.   After Leggett fired this first shot the defendant stepped into the room behind him and soon emerged with a gun in his hand, when he jumped off the gallery and started towards the division fence.   Leggett fired a second shot when the defendant reached a point about midway between the gallery and the fence.   Witness then turned to close the gate and lost sight of the defendant for the time being, but presently heard two shots fired almost simultaneously, and saw smoke ascending from Leggett's gate, where Leggett was standing, and saw the defendant going towards his house from the division fence; from which point smoke was ascending as if from a shot fired from the defendant's gun.   The defendant continued to retreat towards, and finally into, his house, and Leggett continued to fire upon him, firing the last shot as defendant entered his door. In all, Leggett fired five or six shots at the defendant.   Witness was a sister of the defendant.

Mrs. M. E. Adams, the mother of the defendant and of Mrs. Sam Leggett, testified that she was in her house, across the street from Leggett's house, when the shooting took place.   She did not see the first shot fired, but heard the report, and it seemed to her like the report of a pistol.   Witness ran out of her house when she heard the first shot, and saw Sam Leggett standing at his gate, and the defendant in his own yard, about midway between his gallery and the division fence.   She then saw Leggett fire in the direction of the defendant.   This was the second shot fired.   Witness did not know who fired the first shot, but knew that Leggett fired the second.   Witness was not positive, but thought Leggett fired four shots and the defendant one.   The defense closed.

The State, in rebuttal, called John W. Leggett, the prosecuting witness's father.   Witness reached the place of the shooting a minute or two after the shooting ceased.   Upon reaching his wounded son he found a six-shooter lying near him on the ground, which the witness picked up and handed to officer Polk, who arrived on the ground about the same time.   Witness did not notice the condition of the pistol — whether loaded or otherwise — when he picked it up, but its condition was not changed before he handed it to Polk.

W. J. Polk testified, for the State, in rebuttal, that he reached the scene of the shooting a few minutes after the difficulty.   John W. Leggett handed witness a six-shooter, with the request to keep it and permit no one else to handle it.   Witness and Goodwin took

the pistol and two shot-guns, one belonging to John and the other to Sam Leggett, to Goodwin's saloon, and locked them up in Tom Victory's bedroom. Witness did not shoot the pistol off, extract or insert any cartridges in it, nor did any one else after it came into his possession.

J. T. Goodwin was the next witness for the State. He testified that he heard the shooting, and, judging by the sound, he thought the first two shots were fired from a shot-gun, and the last three from a pistol. Witness reached the scene of the difficulty a few minutes after the shooting. W. J. Polk had a large six-shooter in his hand, which, with two shot-guns secured at Leggett's house, he and the witness took to Tom Victory's room in witness's hotel, and told Victory to lock them up. The condition of the pistol was not changed at all while in Victory's room. Neither witness nor Polk examined the pistol to see how it was loaded. A night or two after the difficulty, Jim Leggett got the pistol and guns from Victory's room. On the morning of the difficulty, but before it occurred, Sam Leggett, then on the gallery of witness's saloon, said, in the presence of witness, Victory and Straughn, that the defendant had said something about him that he had to take back or smell shot. Five shots were fired during the difficulty; the first two were fired in quick succession and sounded like the reports of a shot-gun. The other three, fired after a short interval, sounded like the reports of a pistol. Witness was on his saloon gallery when the shots were fired.

Tom Victory was the next witness for the State. He testified that he heard the shooting. The first two shots, fired in quick succession, were fired from a shot-gun. The remaining three, fired after a short interval, were fired from a pistol. Goodwin and Polk, shortly after the shooting, gave witness a forty-four caliber six-shooter and two shot-guns, which they told him to lock up, and to allow no one to have access to them. Witness locked them up in his bedroom. He examined the pistol when he first got it, and found three chambers loaded, and three recently discharged. No one had access to those weapons while in witness's custody. Witness heard Sam Leggett say, on Goodwin's saloon gallery, on the morning of and before the difficulty, that defendant had called him a G—d d—d kinky-headed son-of-a-b—h, and that, if he did not retract, he would make defendant smell shot. Witness was on Goodwin's gallery, about three hundred yards from the place of the shooting, when it occurred. Witness had known Sam Leggett thirteen years. He was a firm and resolute man, but sustained a good

reputation as a quiet and peaceable man. Witness had heard of his being in two difficulties prior to this one — one in Moscow and one in Houston.

James W. Leggett testified, for the State, that he was at his brother John Leggett's store when the shooting occurred. When he heard the shooting he went as fast as he could to Sam Leggett's house. Sam Leggett's wife gave witness Sam's gun at the gate shortly after the shooting. This was one of the guns taken to Goodwin's saloon by Goodwin and Polk. The other was John Leggett's gun, which John took to Sam Leggett's house shortly after the shooting. Witness got those guns and Sam Leggett's pistol from Tom Victory on the night after the shooting. Witness, Sam and John Leggett were brothers.

M. T. Hickman testified, for the State, that Sam Leggett's reputation for peace and quietude was good. Witness had heard of Sam Leggett's participation in one or two difficulties in which firearms were said to have been used.

Mrs. C. E. Leggett, sister of the defendant and wife of Sam Leggett, was the next witness for the State. She was present and witnessed the difficulty between the defendant and Sam Leggett. Joe Jones and his wife first attracted the attention of the witness. When witness first saw Joe Jones he was going rapidly towards the defendant's house, waving his hand. The witness then saw her husband coming home. When Jones waved his hand witness saw the defendant, who had been standing in his door, step into his room. He shortly returned to the gallery with a gun in his hand. He then jumped from his gallery, crossed his yard, and climbed the division fence into Leggett's yard. As the defendant mounted the fence, Sam Leggett backed out of his front gate. As he got upon the fence the defendant remarked: "G—d d—n you, I am going to kill you." When he got down from the fence, the defendant looked at witness, who was then standing on the gallery with her husband's gun in her hands. He then turned and fired upon Leggett, and then ran home, climbing over the division fence. Leggett, after being shot, and while holding to the fence, pulled a pistol and fired three shots at the defendant. His first shot was fired as defendant was getting over the fence on his retreat; the second when defendant was near his gallery, and the third as he entered his door.

The witness testified that she saw Sam Adams when he came for water on the morning of, and before the difficulty. She heard her husband ask him if defendant was well heeled, and heard him tell

Sam to tell defendant that he must retract the·epithet that he had applied or one of them had to shed blood. Witness was in her door when the scuffle over the gun between the defendant and his wife began. She stepped out to her gallery, saw the defendant jerk the gun from his wife's hands, and heard him say: "D—n it, turn me loose." It was before this scuffle that witness saw Joe Jones wave his hand to the defendant. Defendant immediately went into his house, and witness heard his wife say: "Drop it where it is." At this time, and when Jones waved his hand, Sam Leggett·was in sight, coming home. The defendant was inside of Leggett's yard when he fired on Leggett. When the defendant appeared on his gallery with his gun, witness stepped back into her house and got her husband's gun, intending to take it to him to defend himself with.

The questions discussed in the opinion were presented in the appellant's motion for a new trial.

*Hill & Corry* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. I. ˙In all essentials, the defendant's application for a continuance complies strictly with the requirements of the statute. It cannot be questioned that the testimony of the absent witness (defendant's wife) is material. It bears directly upon the vital issue in the case. Upon this issue the evidence was conflicting and apparently evenly balanced. It was therefore of the gravest importance to the defendant to be allowed to cast into his side of the scales this testimony. That the testimony is merely *cumulative* is not an objection that can be urged on a first application for a continuance. "The defendant has the right to prove a material fact by any number of witnesses, within the bounds of reason." ( *Wilson* v. *The State*, 18 Texas Ct. App., 576.) Nor can it be said, in view of the evidence in the case, that the testimony of this witness is not probably true. It is supported by the testimony of some of the witnesses who testified on the trial, and controverted by others. (*Harris* v. *The State*, 18 Texas Ct. App., 287; *Miller* v. *The State*, Id., 232.)

II. We know of no authority which would compel the defendant to go with the court and jury from the court-house to where the absent witness was at the time, that her testimony might be taken. Under the law, the trial must be had at the court-house at the county site of the county. It was there, and there only, that

the case must be heard and determined.  If the defendant could be required to go one-half a mile with the court and jury in order to have the benefit of the testimony of an absent witness, he could be required to go one, two or five miles.  We. cannot sanction such a practice.  All the proceedings in the trial should be conducted at the court-house, the place designated by law for the trial of causes.

If the defendant had consented to the proposition to go with the court and jury to the place where the witness was, and there take her testimony, and if· her testimony had in this manner been taken, we do not think the defendant could have objected to the irregularity.  But that is not the question before us.  In this case the defendant's application for a continuance was refused, one of the grounds of the refusal being that he declined to accept the proposition of the court to go with the jury to the place where the witness was confined by sickness, and there take her testimony.  Such a proposition was, we think, no answer to his application for a continuance, and should not be considered in determining his right to a continuance.

We are of the opinion that the court erred in refusing the continuance, and in refusing to grant the defendant a new trial; and for these errors the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered October 14, 1885.]